699 P.2d 1361

**Berit Elisabet McHUGH,**
**Plaintiff-Respondent,**

v.

**Richard Gregory McHUGH,**
**Defendant-Appellant.**

**No. 14622.**

Supreme Court of Idaho.

April 11, 1985.

Rehearing Denied June 13, 1985.

Robert P. Tunnicliff, Moscow, for defendant-appellant.

Marilyn Schwam, Moscow, for plaintiff-respondent.

HUNTLEY, Justice.

By this appeal we are required to resolve three primary issues:

(1) The classification of Maryland property of Idaho residents upon dissolution of marriage, the property having been purchased by the husband seven months before the marriage;

(2) The separate property interest of the husband in property purchased in Idaho from the proceeds of the sale of Maryland property which under Maryland law was partially "non-marital" and partially "marital"; and

(3) The propriety of the trial court establishing child support for five children at the rate of $250.00 per month per child rather than on a graduated scale basis.

We treat each in turn.

## I.

With respect to the characterization or classification of the Maryland property, the pertinent facts are: Husband purchased the property in his separate name in 1971, approximately seven months prior to the marriage. The parties resided upon and farmed it for approximately six years before moving to Idaho, and owned it for four more years while domiciled in Idaho before the dissolution of the marriage. The property was purchased for $120,000, $10,000 down having been paid from husband's sav-

ings account, $35,000 having been paid at time of closing from proceeds of a loan procured by the husband on his separate credit with the real estate as collateral, with the balance of $75,000 represented by a mortgage and note carried by the seller.

Following marriage, a series of bank and PCA loans were procured under the joint signatures of the parties. The loan proceeds were applied to the payment of the two original mortgages or to one of the preceding loans in the series. Payments were also made upon the two original mortgages from sales of certain farm equipment purchased along with the farm, and in the years 1978 through 1981 from proceeds of sales of subdivided portions of the farm property. The farm also experienced net income and net losses in various years, and income was applied to mortgage payments.

The specific issue is whether the trial court erred in its division of the acreage remaining at the time of divorce as between "non-marital" and "marital" property (similar to separate property and community property under Idaho law) under a formula whereby it assigned non-marital status to that portion of the property represented by the percentage that the husband's initial separate contribution bore to the $120,000 purchase price.

This issue must be resolved by the law of the state of Maryland, most definitively expressed in *Harper v. Harper*, 294 Md. 54, 448 A.2d 916 (1982).

In *Harper*, the Maryland court characterized the distinguishing factors for clarifying property in the majority of community property states, such as Idaho, as contrasted with states such as Maryland which model their laws on the Uniform Marriage and Divorce Act, as being (1) whether the property takes on its character as marital or non-marital at the date of its initial legal

acquisition; or, (2) whether the character is in some instances established at a later date due to subsequent events. The Maryland court, rejecting the date of initial acquisition as being determinative under cases such as Idaho's *Gapsch v. Gapsch*, 76 Idaho 44, 277 P.2d 278 (1954) and *Fisher v. Fisher*, 86 Idaho 131, 383 P.2d 840 (1963), stated that "acquisition" does not occur at the date of initial legal obligation, but rather is an ongoing process of making payment for property.[1]

In rejecting the inception of title approach, the Maryland court commented upon Idaho's *Fisher* case, which stated:

> Under this rule, property to which one spouse has acquired an equitable right before marriage is separate property, though such right is not perfected until after marriage. *Harper* at 922 citing *Fisher*.

The court referred to *Gapsch* and similar cases from other community property jurisdictions:

> Courts in such jurisdictions have held that increases in the value of a spouse's separate property, attributable solely to the normal appreciation of such property, remain a part of the separate property and require no reimbursement to the community. *Harper* at 922.

The court noted that under the *Gapsch* rule the community gets compensation only for the increase in value attributed to community funds and efforts, and gets nothing for appreciation in value.

The *Harper* court then discussed the California rule which provides that the spouse contributing separate funds is entitled to a "pro tanto community property interest" in the property and improvements in the ratio of the separate investment to the total separate and community investment in the property, noting that the California rule provides a more equitable result:

> of Idaho law where property is purchased on community credit.

---

1. The *Harper* court did not have the benefit of *Winn v. Winn*, 105 Idaho 811, 673 P.2d 411 (1984), which more fully enunciates the status

As a result of the application of the California rule, both the spouse who contributed separate funds and the community that contributed community funds each receive a proportionate and fair return on their investment. Contrary to the rule adopted in most community property states, the California rule does not limit the community to compensation for a share of the enhanced value of the property attributable to the expenditure of community funds and efforts, but rather entitles the community additionally to share in the increased value attributable to the normal appreciation of the property.

The rationale underlying California's "pro tanto community property interest" rule is the source of funds theory. That theory is premised on the concept that it is unfair to permit a spouse who has contributed separate funds to the purchase or improvement of property to enjoy all of the benefits of sole ownership of the property without regard to the fact that it had been purchased or improved in part with community funds. *Harper* at 924.

The *Harper* court, after observing that the California pro tanto theory is in fact a source of funds theory, quoted with approval the following language from *Tibbetts v. Tibbetts*, 406 A.2d 70 (Me.1979):

> In thus interpreting the process of separating marital and non-marital property which has been conjoined in the acquisition of a single property during marriage, we find guidance in the fundamental purposes underlying the approach to disposition of the spouses' property mandated by 19 M.R.S.A. § 722–A and Section 307 of the Uniform Marriage and Divorce Act as originally promulgated in 1970. This research suggests that our choice is between a static or a dynamic interpretation of the term "acquisition." We adopt a dynamic interpretation in that the proper characterization of prop-

erty as marital or non-marital may shift as individual items of property, marital or non-marital, are contributed by the spouses in exchange for the property acquired.

The approach we choose comports with the general goals of the Uniform Act.

. . . . .

The partnership theory, upon which the law of community property and this provision of the Uniform Marriage and Divorce Act is based, requires that the marital estate be entitled to a proportionate share in the value of property where its equity interest was partially acquired by marital funds. Where the marital estate chooses to invest its funds in certain property together with non-marital funds, the marital estate is entitled to a proportionate return on its investment.

. . . . .

Our interpretation of the term "acquisition" has led us up and down the American West and even to the shores of Old Spain. It appears that the courts of our community property states have not with ease adapted to the realities of complex modern transactions and relationships. We conclude that in fairness to both spouses "acquisition" must not arbitrarily and finally be fixed on the date that a legal obligation to purchase is created. Rather, "acquisition" should be recognized as the on-going process of making payment for acquired property. Characterization of the property acquired will then depend on the source of each contribution as payments are made. *Harper* at 925–26 citing *Tibbetts* (citations omitted) (footnotes omitted).

The *Harper* court next explored whether the problems might best be resolved by using the concept that commingling of non-marital and marital property results in a "transmutation" into marital property, citing the Illinois rule as expressed in, *In re Marriage of Smith*, 86 Ill.2d 518, 56 Ill. Dec. 693, 427 N.E.2d 1239 (1981): [2]

---

**2.** *In re Marriage of Smith* has been superseded by statute as stated *In re Marriage of Brown*, 127 Ill.App.3d 831, 83 Ill.Dec. 5, 469 N.E.2d 612 (1984).

We accordingly hold that the preference indicated by the legislature for the classification of property as marital can best be served by presuming that the contributors of marital property to non-marital property intended that the commingled property be treated as marital. In other words, the failure of a non-marital property holder to segregate that property will give rise to the rebuttable presumption that the non-marital property has been transmuted, regardless of the status of title. *Harper* at 927.

Finally, after also rejecting the transmutation approach, the *Harper* court adopted the source of funds theory, enunciating the Maryland rule as follows:

We conclude that under the Maryland Act the appropriate analysis to be applied is the source of funds theory. Under that theory, when property is acquired by an expenditure of both non-marital and marital property, the property is characterized as part non-marital and part marital. Thus, a spouse contributing non-marital property is entitled to an interest in the property in the ratio of the non-marital investment to the total non-marital and marital investment in the property. The remaining property is characterized as marital property and its value is subject to equitable distribution.

*Thus, the spouse who contributed non-marital funds, and the marital unit that contributed marital funds each receive a proportionate and fair return on their investment.* (Emphasis added). *Harper* at 429.

Maryland Code (1974, 1980) § 3–6A–01(e) provides that marital property is: "... all property, however titled, acquired by either or both spouses during their marriage. It does not include property acquired prior to the marriage, property acquired by inheritance or gift from a third party, or property excluded by valid agreement or property directly traceable to any of these sources."

■ In the instant case, the formula used by the trial court did not follow the *Harper* methodology. Appellant husband, while objecting to the trial court's methodology, never computed or presented either to the trial court or to this court on appeal the result which would flow from use of the *Harper* formula. We have now performed the calculation. It appears this appeal was most improvidently filed, in that the expenses of this appeal far exceed the difference in result, as we shall presently demonstrate. The trial court's computation resulted in a marital (community) interest and equity in the Maryland property of $77,396.34. The *Harper* formula results in a figure of $77,789.00 calculated as follows:

$$\text{Husband's non-marital share} = \frac{\text{Non-marital contribution}}{\text{Non-marital contribution} + \text{Marital contribution}} \times \text{Value of the Property}$$

CONTRIBUTIONS TO
MARYLAND PROPERTY

| Year of Contribution | Payments Toward[3] Property Mortgaged | Husband's Non-marital Contribution | Marital[4] Contribution |
|---|---|---|---|
| 1971 | $ 10,000 down payment 2,100 | $10,000 (Husband's savings) 1,550 (farm income) 550 (loan on husband's life insurance) | –0– |

3. The McHughs took out numerous loans in series over 7 years, some using the farm property as collateral. The loans were used to pay on the two original mortgages or to retire the previous loans in the series. The payments reflected here are only those which went to the two original mortgages, and not to paying off the later loans.

4. After the parties were married in 1972, all the loans they took out were signed by both of them, and ultimately were paid off with community funds. Therefore the proceeds of these loans are considered marital contributions.

| Year of Contribution | Payments Toward[3] Property Mortgaged | Husband's Non-marital Contribution | Martial[4] Contribution |
|---|---|---|---|
| 1972 | $ 13,700 | $ 2,356 (1971 farm & timber) (income) | $ 11,344 (PCA & life insurance loan) |
| 1973 | $ 13,400 | –0– | $ 13,400 (PCA & FHA Loans) |
| 1974 [5] | $ 13,100 | 135 (farm income) | $ 12,976 (PCA & bank loans, farm income) |
| 1975 [6] | $ 12,800 | –0– | $ 12,800 (PCA, bank loans) |
| 1976 | $ 12,500 | –0– | $ 12,500 (PCA loan) |
| 1977 | $ 11,252 | –0– | $ 11,252 (PCA, bank loans) |
| 1978 [7] | $ 12,319 | $ 2,020 (non-marital proceeds of land sale) | $ 10,299 (Marital proceeds of land sale) |
| 1979 | $ 48,400 | $ 1,376 (non-marital proceeds of land sale) | $ 47,024 (Marital proceeds of land sale and bank loans) |
| 1980 | $ 4,200 | $ 504 (non-marital proceeds of land sale) | $ 3,696 (farm rent, land income, land sales proceeds) |

5. By 1974 husband's separate share of the property was .36, that is

$$\frac{\$14,456}{\$14,456 + \$24,744}$$

Farm income was apportioned on the basis of that ratio.

6. In 1975 $9,800 worth of equipment was sold. Most of this equipment was purchased with the farm; therefore the proceeds of its sale would be apportioned between non-marital and marital property, applying the ratio which existed immediately prior to the sale. The same year the McHughs had proceeds of two loans which were more than the amount of payments on the original mortgage. Maryland law requires that to be non-marital, property must be directly traceable to a non-marital property source. Since appellant husband has failed to show that any equity in the farm is directly traceable to contribution from the non-marital share of the equipment proceeds, they will not be credited as a non-marital contribution.

7. Non-marital proceeds of the land sales not traceable to equity in the farm property are treated in the same manner as were the equipment proceeds. See n. 6, *supra*.

| Year of Contribution | Payments Toward[3] Property Mortgaged | Husband's Non-marital Contribution | Martial[4] Contribution |
|---|---|---|---|
| 1981 | $ 3,500 | $ 420 | $ 3,080 |
| Total Contribution | $157,271 | $18,911 | $138,360 |

Based on the above figures, husband's non-marital share of the Maryland property as of the date of divorce is 12.0%, calculated:

$$\frac{\$18,900}{\$18,900 + \$138,371} = .12$$

The trial court found that the value of the Maryland property still owned by McHughs is $103,500. This figure is reduced by the $15,104 mortgage encumbrance still on the property to $88,396. Husband's 12.0% non-marital share is $10,607, leaving as marital property $77,789. The trial court found the marital (community) interest in the Maryland property to be $77,396.

Accordingly, the findings, conclusions and judgment must be, and hereby are, modified to provide an additional community equity in the Maryland property in the sum of $393.

## II.

The second issue is whether the court erred in failing to find a separate property interest in the husband in the real property acquired by the parties as their home when they moved to Idaho in 1977. The evidence establishes that in 1978 a $5,000 payment on the Idaho property mortgage was made with proceeds from the sale of a parcel of the Maryland property. Using the ratio applicable at the end of 1977, Mr. McHugh's separate property contribution is 16.4% of $5,000 or $810. The Findings of Fact, Conclusions of Law and Judgment are hereby amended accordingly.

## III.

Finally, we consider the appropriateness of the trial court stating the child support award in terms of $250 per month per child for each of the five children, instead of establishing a graduated scale based upon the premise that once such items as housing and utilities are provided, the cost of providing for each succeeding child is less. The record establishes that the court was furnished computations based upon total annual expenses and total annual income of each of the parties and the court found that the support required by the wife for the children would be $15,000 per year. On this issue the trial court specifically noted:

> ... it was my intention in fixing ... these child support amounts was to have an amount that the mother could count on every month to maintain the children in a proper fashion.
>
> Now, it's up to her to budget and manage the money, and may mean there isn't enough money some months and there's some money left over other months, but during the course of the year it's up to her to balance it out and see if there is enough.

Thus, the trial court properly formulated the judgment.

Husband also requests that child support be reduced by the amount he spends on food while the children visit him during the summer. Additionally, Mr. McHugh asserts that the total monthly or annual child support is unreasonably high in view of the circumstances of the parties.

The findings of fact do not disclose whether the court gave adequate consideration to the duty and ability of the wife to provide support, and the ability of the husband to make payments at the awarded level in light of his fixed expenses. It further appears that the child support may have been fixed at a level which results in

the husband's annual non-discretionary fixed expenses constituting an unreasonable portion of his available net income after taxes. The findings do not address what, if any, consideration was given to the expense of transporting the children for summer visitation and for offset for their keep by the other spouse during the summer. Findings and conclusions as to these matters are a necessary predicate to determination of the level of support.

Accordingly, we reverse the award of child support and remand for further and more specific findings as to these considerations, with the level of child support to be fixed based upon all relevant considerations.

## CONCLUSION

The original judgment provided for a net payment by the husband to the wife of $55,997.99, representing ½ of the community interest. That figure was subsequently amended to $27,497.99 by virtue of certain exchanges in the obligations and items of property awarded to the respective parties by an amended judgment. Based on our analysis of Parts I and II of this opinion, the judgment is amended downward by $613.50,[8] making a total judgment in favor of the wife and against the husband of $27,094.49, together with interest from May 1st, 1982, the date established in the court's judgment of April 1st, 1982, for the commencement of interest.

Costs to be divided equally. No attorney fees awarded.

DONALDSON, C.J., and BISTLINE, J., concur.

BAKES, J., concurs in parts I and II; concurs in the result in part III.

SHEPARD, Justice, dissenting.

During the fourteenth century, Clement V. excommunicated Bologna, which had become a university center for learning and scholarship. The students and faculty were divided among Padua and other centers of learning. The response of the cognoscenti of that day rings down the centuries and is applicable to the majority opinion of today. *Quomodo secatur, manet Bologna.*

Prior to the marriage, the defendant-husband herein purchased the Maryland property and made a substantial down payment thereon. The value of that property doubled and perhaps trebled in a few short years. During those years, loans were secured, with the property serving as security. Approximately half of the property was sold in differing parcels, and some of the proceeds were utilized for the purchase of the Moscow, Idaho property. The majority asserts that the husband had invested approximately $19,000 of his non-marital assets in the property.

The majority's arithmetic legerdemain converts the marital interest in the Maryland property from zero in 1972 to a figure of approximately $77,000 in 1979, while the husband's non-marital interest in the property is miraculously reduced to approximately $10,000. That process may well leave observers breathless. If the intent of the majority is that "the spouse who contributed non-marital funds, and the marital unit that contributed marital funds each receive a proportionate and fair return on their investment," then the Court has produced a new and strange world of fairness and equity.

Since the division of these various properties is so interwoven, and since the parties have stipulated as to the distribution of the Idaho properties to the wife in return for a reduction of the monetary judgment, I doubt that any effectual changes can be made.

I agree with the majority that the matter of child support must be remanded. How-

---

**8.** Husband's $810 separate property contribution to Idaho property less $196.50 additional marital interest (½ the $393.00 increase) equals $613.50.

ever, in my view, it should be reversed. The husband is a Commander in the United States Navy and subject to governmental assignment. At the time of trial, his station was a small sea coast town in Maine. He received custody of one of the children. His after-tax income is approximately $25,000 per year. The wife, on the other hand, is well educated, speaks five languages, and has a history of employment. She, however, does not desire employment, but would prefer to stay home and write books.

The trial court awarded the wife $15,000 per year in child support. Travel expenses for the children to spend the summer months with their father were then approximately $2,000 per year. Thus, the husband was left with approximately $8,000 annually. Inexplicably, the trial judge refused to order any dimunition of the monthly child support during the two summer months, when the husband would have custody of the children.

One might expect that some of the husband's obligations might be liquidated by the sale of the Maryland property. Such an eventuality, however, was prevented by action upon the Idaho judgment in Maryland, with a resultant lien upon the Maryland property. The trial court refused to stay those foreign actions pending appeal, and he further issued orders of garnishment on the husband's pay to the appropriate officials of the U.S. Navy. Notably, the situation is not one in which the husband has refused to pay child support. The record indicates regular and substantial payments every month.

In my view, this action has already been pending for too many years, with the inevitable disastrous consequences falling upon the parties and their children. I see no way to adequately untangle the property affairs of the parties and would leave them to the settlement at which they arrived. As to the child support, I would reverse the trial court decree and direct the entry of an order for child support in the amount of $800 per month (approximately the same amount initially contracted for by the parties and their attorneys). I do not say that such is an adequate amount to support and raise the children in the mother's custody. In any but the wealthiest families, upon a divorce, particularly where children are involved, substantial changes in life style inevitably take place. Each parent, if able, must contribute to the support of the children. I.C. § 18–401; *Shumway v. Shumway*, 106 Idaho 415, 679 P.2d 1133 (1984). If a well-educated father with a history of employment became unemployed because he preferred to sit home, drink beer, watch the sun set, and write poetry, he would draw little sympathy when he failed to pay child support. What is sauce for the gander should not be made into a horse of a different color.